Joseph G. Sansone
Christopher J. Dunnigan
Lindsay S. Moilanen
Cynthia A. Matthews
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-0061 (Dunnigan)
dunnigancj@sec.gov

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                Plaintiff,<br><br>      -against-<br><br>EDUARDO HERNANDEZ,<br>CHRISTOPHER FLAGG,<br>DAQUAN LLOYD, and<br>COREY ORTIZ,<br><br>             Defendants. | <u>COMPLAINT</u><br><br>23 Civ. 8110<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Eduardo Hernandez ("Hernandez"), Christopher Flagg ("Flagg"), Daquan Lloyd ("Lloyd"), and Corey Ortiz ("Ortiz") (collectively "Defendants"), alleges as follows:

<u>SUMMARY</u>

1.      This matter involves a sophisticated version of a traditional "free-riding" scheme perpetuated by Defendants, all residents or former residents of and with ties to Copiague, New York, from approximately November 2018 through January 2022, that resulted in profits of at least $2 million at the expense of broker-dealer A ("Broker A").

2.      "Free-riding," in this instance, describes the fraudulent practice used by Defendants to essentially steal an "instant deposit" credit extended by certain broker-dealers, by engaging in matched trading in illiquid securities without ever funding the trading account to which the credit was extended.

3.      Here, Defendants engaged in free-riding by taking advantage of the instant deposit credit feature of Broker A.  Defendants converted this instant deposit credit into cash for themselves by using a trading strategy that involved executing matched trades in illiquid options between unfunded loss-bearing "loser" accounts ("Loser Accounts") at Broker A (and other broker-dealers with similar credits) and profitable "winner" accounts ("Winner Accounts") at other broker-dealers.  Because Defendants controlled both sides of these matched trades, they were able to execute these trades at artificial prices and repeatedly generated trading profits in the Winner Accounts and trading losses in the Loser Accounts held at Broker A.

4.      Defendants' matched trading strategy guaranteed their profits at Broker A's expense.  As described in more detail below, at Defendants' direction, the Loser Accounts were never funded by the account holders, despite those account holders representing to Broker A they had sufficient funds in linked bank accounts.  Given the timing of the trading in the accounts, Defendants' strategy generally allowed them to exhaust the instant deposit credit in the Loser Accounts by the time Broker A's systems received notice of the insufficient funds in the bank accounts.

5.      When Broker A subsequently restricted trading in the Loser Accounts, Defendants (or their proxies) abandoned them, leaving Broker A with a loss equal to the trading losses generated in these Loser Accounts and debited from the instant credit the accounts had received.  Defendants (or their proxies) then simply opened new Loser Accounts in which they continued to conduct the free-riding scheme.

6.      Hernandez was the mastermind of the fraudulent scheme.

7.      Hernandez brought Flagg into the scheme early on and by at least July 2020, had taught Flagg how it worked, allowing Flagg to become another principal executing the scheme. Hernandez and Flagg (together, the "Principals") each held Winner Accounts in his own name and controlled and used Winner Accounts in the names of others with whom they had ties and whom they had recruited to open accounts to trade in as well.

8.      The Principals recruited at least one individual ("Recruit 1") to open a Loser Account at Broker A for use in the scheme. Subsequently, at the Principals' direction, Recruit 1 recruited additional individuals to open Broker A accounts. Recruit 1 engaged in these efforts through posting to social media outlets, such as Instagram, a screenshot of a profitable brokerage statement alongside offers for people to make quick, easy cash.

9.      Like Recruit 1, Lloyd and Ortiz's role in the scheme was primarily in the recruitment of account holders. Lloyd and Ortiz (together "the Recruiters") targeted individuals who would agree to open new Broker A Loser Accounts or provide access to existing Broker A accounts for a nominal sum (the "Recruits"). The Principals, with the Recruiters' knowledge, used these Loser Accounts for engaging in the matched trading scheme.

10.     The Recruiters directed their own Recruits on how to open Broker A accounts and/or bank accounts, and to link Broker A accounts to bank accounts, purportedly to fund the trading. However, the Principals, directly and indirectly through the Recruiters, warned at least some Recruits not to leave any money in the linked bank accounts, so that there would be no money to be transferred to the Broker A Loser Accounts to fund those accounts' unprofitable trading.

11.     The Recruiters each provided their Recruits' Broker A account login credentials to the Principals, so that the Principals could access and control the accounts and trade in the names of the opening account holders. The Principals paid the Recruiters per account they provided, typically $300-500.

12.    The Principals' matched trading strategy worked as follows: in the Winner Accounts, the Principals offered illiquid put option contracts for sale at highly inflated, non-market prices. At the same time, they bought those securities in the Broker A Loser Accounts at those inflated prices. Almost immediately thereafter, the Principals executed trades in the Winner Accounts to buy the options back from the Loser Accounts at the lower market price, closing out the transaction and locking in profits for the Winner Accounts and the losses in the Loser Accounts. In this way, the Principals effectively transferred the instant deposit credit from the Broker A account to their Winner Accounts.

13.    The Principals used brokerage accounts in their own names and in the names of the Recruiters as Winner Accounts, as well as brokerage accounts in the names of unsophisticated friends and/or family (the "Nominees"). The Principals told each Nominee that they (Hernandez or Flagg) would trade in the Nominee's account. The Principals then generally directed the transfer of the profits from the Winner Accounts to themselves, either directly or indirectly. The Principals essentially paid the Nominees a sum that purportedly was to represent the Nominees' portion of the trading profits.

14.    All told, over the four-year period, from approximately November 2018 to January 2022 (the "Relevant Period"), Defendants used at least 600 Broker A Loser Accounts to conduct the fraudulent scheme, earning net profits of more than $2 million, equivalent to the amount of net loss Broker A suffered.

## VIOLATIONS

15.    By virtue of the foregoing conduct and as alleged further herein, Defendants Hernandez and Flagg directly violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)] and further violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) by acting

through or by means of another person in violation of Exchange Act Section 20(b) [15 U.S.C.

§ 78t(b)].

16.     Defendants Lloyd and Ortiz aided and abetted Defendants Hernandez's and Flagg's

violations of Exchange Act Section 10(b) and Rule 10b-5(a) and (c), in violation of Exchange Act

20(e) [15 U.S.C. § 78t(e)].

17.     Unless Defendants are restrained and enjoined, they will engage in the acts, practices,

transactions, and courses of business set forth in this Complaint or in acts, practices, transactions,

and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

18.     The Commission brings this action pursuant to the authority conferred upon it by

Exchange Act Sections 21(d) and (e) [15 U.S.C. §§ 78u(d), (e)].

19.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from

violating Exchange Act Section 10(b) and Rule 10b-5 thereunder; (b) imposing conduct-based

injunctions prohibiting (i) each of Hernandez and Flagg from, directly or indirectly, trading securities

in any brokerage account he owns, controls, or has access to that does not have settled cash equal to

or greater than the amount of the securities trade(s); and (ii) each Defendant from opening a

brokerage account without first providing to the relevant brokerage firm(s) a copy of the

Commission's filed complaint in this matter and any judgment that the Commission may obtain

against him in this matter; (c) ordering Defendants to pay disgorgement and prejudgment interest

pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

(d) ordering Defendants to pay civil money penalties pursuant to Exchange Act Section 21(d)(3) [15

U.S.C. § 78u-1(d)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to Exchange Act Sections 21(d), (e) and 27(a) [15 U.S.C. §§78u(d)-(e) and 78aa(a)].

21.     Among other things, Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails or of the facilities or a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged herein.

22.     Venue lies in this District under Exchange Act Section 27 [15 U.S.C. § 78aa]. Certain of the acts, practices, courses of business and transactions constituting the violations alleged herein occurred within this District, including that Defendants were each residents of this District during all or part of the time that they conducted the fraudulent scheme, engaged in trades while located in this District, and that they withdrew from and/or deposited cash into branches of financial institutions located within this District in connection with the fraudulent scheme.

## DEFENDANTS

23.     **Eduardo Hernandez**, age 33, is a resident of Lindenhurst, New York.

24.     **Christopher Flagg**, age 28, is a resident of Copiague, New York.

25.     **Daquan Lloyd**, age 28, is a resident of Copiague, New York.

26.     **Corey Ortiz**, age 29, is a resident of Greensboro, North Carolina, and was formerly a resident of Copiague, New York at various points prior to the commencement of the Relevant Period, and was a resident of Babylon, New York, during part of the Relevant Period.

## FACTS

**A.      Background**

27.     As described in the Summary section above, Defendants engaged in a sophisticated and complex free-riding scheme that took systematic advantage of Broker A's instant deposit credit

to fund their guaranteed-to-be-profitable matched trading, at Broker A's expense during the Relevant Period.

28.    As described in more detail below, by free-riding on the instant deposit credit at Broker A to fund the trades matched with the trades in the Winner Accounts, Defendants were able to essentially transfer Broker A's instant deposit credit to the Winner Accounts that Defendants controlled.

29.    Defendants were limited in the amount of profit they could obtain from any one Loser Account to the maximum instant deposit credit Broker A extended it, here, $5,000 as described below.

30.    Once the instant deposit credit was exhausted, the account was useless, because Defendants had no intention of funding the account and because Broker A, once it learned there were insufficient funds available to fund the trading, froze the account, ultimately closing it entirely.

31.    Accordingly, in order to perpetuate the scheme and the flow of profits, Defendants needed more Recruits to open new Loser Accounts in which to trade – they "need[ed] to find more 'Gold'," meaning Loser Accounts at Broker A, in Hernandez's and Flagg's words.

32.    Ultimately, Defendants churned through over 600 Broker A Loser Accounts.  From approximately February 2020 through February 2021, at least 244 Broker A accounts were opened and traded in, in connection with Defendants' fraudulent scheme.  During that time frame, only 14 devices were used to access these 244 Broker A accounts for trading.

**B.    Defendants Establish Winner and Loser Accounts to Facilitate Free-Riding Scheme**

    **1.    Establishment of the Loser Accounts at Broker A**

        a.    <u>Broker A's Account Types and Instant Deposit Credit</u>

33.    Broker A's instant deposit credit feature gave account holders, upon initiating the transfer of sufficient funds from their linked bank account to their Broker A account, immediate

access to trading funds in the form of a credit. Absent the instant deposit credit, these account holders ordinarily would have had to wait for the transfer of such funds to clear before they could trade. The instant deposit credit was essentially a loan to the account holder to trade with, while waiting for the funding of the account to be completed.

34.     During the Relevant Period, Broker A offered Broker A Gold ("Gold"), a subscription service that offered account holders with a portfolio value of up to $10,000, margin accounts and an instant deposit credit equal to the amount of the funds requested to be transferred into the account up to $5,000.

35.     The instant deposit credit became available to the account holder as soon as he or she: (1) linked a bank account in their name to their Broker A account; and (2) initiated an ACH funds transfer deposit (requesting a specific amount be transferred) from the linked bank account to their Broker A account.

36.     Broker A used a third-party platform to facilitate the linking of a customer's bank account to their Broker A account. The platform required the Broker A account holder to enter their bank account login credentials, thereby verifying the account holder's control of the bank account. It then confirmed matching account details, such as account name, account type and/or address, before linking the bank account to the Broker A account.

37.     Once the account holder's bank account and Broker A account were linked, the account holder initiated the transfer of funds from the linked bank account to the Broker A account. The account holder's initiation of the funds transfers triggered Broker A's deposit of the instant credit into their Broker A account, allowing the account holder to trade while the transfer, a process that could ordinarily take up to five business days to complete, was pending.

b.     Broker A Account Opening and Account Holder Representations

38.     Broker A account holders made several representations in connection with opening a

Broker A account, pursuant to Broker A's customer agreement ("Customer Agreement").  As the account application process was online and conducted through mobile applications, prospective account holders agreed to abide by the conditions of the Customer Agreement by tapping or clicking the "Submit Application" button on their phones or other devices, which functioned as the electronic equivalent of the account holder's signature.

39.    Among other things, by entering into the Customer Agreement, Broker A account holders, with respect to accounts Broker A opened on their behalf as owner of the account ("My Account(s)"), represented and warranted to Broker A that:

40.    "[T]here are sufficient funds in My External Account... ["an account I own at another institution"] … to cover the amount of the deposit to My Account."

41.    "I am solely responsible for keeping My Account numbers and PINS … [ "PINS shall mean My username and password"] … confidential and will not share them with third parties."

42.    "[T]he information contained in this … [Customer] Agreement, the account application, and any other document that I furnish to … [Broker A] … in connection with My Accounts is complete, true and correct," … and "that knowingly giving false information for the purpose of inducing [Broker A] to extend credit is a federal crime."

43.     "I … agree not to allow any person to trade for My Account unless a trading authorization for that person has been received and approved by [Broker A]."

        c.    <u>Recruitment of Account Holders and Opening of the Loser Accounts, Generally</u>

44.    Because the Principals' scheme relied on taking advantage of the instant deposit credit at Broker A (and similar credits at other broker-dealers), opening numerous Loser Accounts at Broker A was a critical part of their scheme.

45.    All of the Defendants played a role in opening the Loser Accounts at Broker A.

46.    The Principals directly, or indirectly through the Recruiters, solicited the Recruits,

individuals who had little trading experience and did not ask many questions.

47.     The Recruiters frequently used social media outlets, like Instagram, to seek out new Recruits through promises of easy cash.

48.     The Principals both told at least Recruit 1 to tell Recruits that they could make money by opening a Broker A account for Defendants to trade in and told Recruits this directly on certain occasions.  The Principals, directly and through the Recruiters, paid the Recruits nominal sums to open these accounts.  Each Defendant determined individually what amount he would pay his own Recruits; amounts typically ranged from $25 to $300.

49.     In addition to directing Recruits to set up a Broker A account, Defendants directed Recruits to link their Broker A account to a bank account and assisted them in doing so when necessary.  Linking bank accounts to the Broker A accounts was essential to obtaining access to the instant deposit credit.

50.     Defendants knew, or were reckless in not knowing, the nature of the representations required of account holders to open accounts, having each held Broker A accounts, or accounts at other broker dealers that granted instant deposit credit, in their own names prior to, and/or during the Relevant Period.

> d.     Recruitment of Account Holders and Opening of the Loser Accounts by the Principals and Recruit 1

51.     The Principals, directly or through the Recruiters, directed Recruits to provide their Broker A account login information.  The Principals then, with the knowledge of the Recruiters, used the Broker A accounts to engage in a matched trading scheme.

52.     For example, in the summer of 2020, the Principals directly recruited Recruit 1 by offering an opportunity for Recruit 1 to make "easy money" if he opened a Broker A account for them to trade in.

53.     Recruit 1 had little trading experience and did not have a Broker A trading account at

the time.  Recruit 1 agreed to open the account without asking any questions.

54.    The Principals then directed Recruit 1 to set up and link a bank account to that Broker A account.  They specifically warned Recruit 1 to make sure there were no funds in the linked bank account, so that Broker A could not receive money from that account.  The Principals directed Recruit 1 to provide them Recruit 1's Broker A account login credentials; Recruit 1 did as directed and was paid approximately $500 to do so.

55.    Recruit 1 subsequently received notice from Broker A that Recruit 1's Broker A account balance had dropped to roughly -$4,000 and that Broker A planned to terminate the account.  The Principals told Recruit 1 not to worry, that they had discovered a "loophole" in Broker A's systems, that Broker A would eventually terminate the account and that it would all eventually "blow over."

56.    Shortly thereafter, Recruit 1 began recruiting others to open Broker A accounts for the Principals to use to perpetrate the scheme.

57.    Recruit 1 solicited additional Recruits by posting to social media outlets (such as Instagram) a screenshot of a profitable brokerage statement that he received from a Principal, alongside offers for people to make quick, easy cash.  Dozens of people responded to the posts and agreed to give their existing accounts to, or to set up new Broker A accounts for, Defendants in exchange for a nominal sum.

58.    Recruit 1 further helped the Recruits set up online bank accounts - typically at banks or digital banking services that had no minimum balance requirements or monthly fees and required no credit check - to link to their Broker A accounts.

59.    As Recruit 1 had been directed to do by the Principals, Recruit 1 in turn warned Recruits not to leave any money in their linked bank accounts.

60.    Through this activity, the Principals directly and indirectly, acting through the

Recruits, made misrepresentations to Broker A with respect to the Recruits' accounts, which they controlled.

61.     Specifically, the Principals misrepresented, directly and indirectly, that they had sufficient funds in their linked bank accounts to repay any instant deposit credit extended to them and that they were protecting the integrity of their accounts, in violation of the Broker A Customer Agreement.

62.     The Principals directly, and indirectly through Recruit 1, instructed Recruits not to fund their linked bank accounts so that Broker A could not obtain repayment of the instant deposit credit it had extended.

63.     The Principals further directly, and indirectly through the Recruiters, obtained from the Recruits control over the Recruits' Broker A accounts, as unauthorized third parties in violation of the Customer Agreement.

      e.     <u>Recruitment of Account Holders and Opening of the Loser Accounts by the Recruiters</u>

64.     The Recruiters each recruited dozens of people to open Broker A accounts and link the Broker A accounts to online bank accounts.  Each provided the Principals with the account login information for accounts in the names of the individuals that they had recruited for this purpose.  The Recruiters were each paid an amount that they agreed upon with the Principals for each account they provided to the Principals.  Each Recruiter determined what portion of the amount he received from the Principals, would be paid to the Recruit.

65.     For example, on February 20, 2021, Ortiz asked Hernandez if he needed any Broker A accounts, to which Hernandez replied "yes." Ortiz then responded that he "got one coming up" and told Hernandez to "send that payment thru."

66.     Again, on March 5, 2021, Ortiz told Hernandez that he had "work" for Hernandez, a code name for account login information, on information and belief, if Hernandez would "cashapp"

him.[1]  When Hernandez told Ortiz to send the "work," Ortiz texted Hernandez an email address, a password and a code.  Hernandez agreed to pay Ortiz $500, which Hernandez sent via Cash App to Ortiz in bitcoin later that day.

67.    In addition, Hernandez told Lloyd that he traded in the Broker A accounts and that he would "run up" the accounts.  For example, on or about December 22, 2020, Hernandez sent a text message to Lloyd asking him if he had "work" ready for the next day.  When Lloyd indicated that he did, Hernandez directed Lloyd to make sure to have the accounts ready to go because he was "running work tomorrow and paying same day…".  Hernandez told Lloyd that he planned to "be blowing up ya phone in the morning by trading hours 10 am."

68.    Hernandez also told Lloyd that he (Hernandez) would only pay for a Broker A account that gave instant deposits, that he could get money from the Broker A account only if the instant deposit works and that the account was useless without the instant deposit.  For example, later on December 22, 2020, Hernandez told Lloyd "if the works good same day pay."  Lloyd responded, "yes they verified bro I come correct".  A few minutes later Hernandez told Lloyd that Broker A is "now blocking everything, smh [sic]…"  Lloyd responded "[Broker A] blocked?" and when Hernandez answered "yeah they are closing the account without warning" Lloyd texted, "well these two are good so…".  Lloyd then texted, "so u not giving me the money upfront because of that" and Hernandez responds "Pretty much, I can't pay out bands … [on information and belief, a specified amount of cash] … if the work doesn't even give the instant deposits that's my point.  If the instant deposit works then I can get the bread from them.  If it doesn't it useless."

69.    Ortiz knew that Hernandez was using Broker A's instant deposit credit to effect the trading scheme: Ortiz knew that the Principals would only pay him for Broker A accounts that were

---

[1]    Cash App is a peer-to-peer payment service that lets users quickly send and receive money from their mobile devices.

"good" – ones in which "the instant deposite [sic] went thru".

70.     Ortiz also knew that Hernandez would "run up" the Broker A accounts as part of the scheme.  For example, on one occasion, on December 18, 2020, when Ortiz sought payment from Hernandez for providing him with account credentials for a Broker A account, he told Hernandez "It was good when I gave it to u."  Hernandez responded to Ortiz: "the next morning it was restricted before I even had a chance to use it.  Log in, you'll see its not negative."

71.     Ortiz also acknowledged to Hernandez that he knew the existence of the Broker A "loophole."

72.     The Recruiters' role in opening new Broker A accounts provided substantial assistance to the Principals by, among other things, allowing them to take advantage of the instant deposit credit.

73.     The Recruiters knew or were reckless in not knowing the Principals were using the Loser Accounts as part of a trading scheme.

> f.     Defendants' Control and Use of the Loser Accounts

74.     Under Broker A's protocols, when a potential account holder applied to open an account, they provided an email address and set up a password.  Once the account application was approved, the provided email became the username for the account and the account holder used the established username and password to access the account.  The username was unique to the account holder and could not be changed (nor could it be used as a username by any other account holder), but the password and contact email addresses, to which notifications about the account were sent, could be changed.

75.     By early 2019, Broker A also used a two-factor authentication system to authenticate or verify the account holder's identity when an account holder attempted to log in from a new device, or when the phone number or email associated with an account was changed; in that regard,

Broker A would send a code to the account holder by text and/or email, which the account holder would need to enter on their device to access the account.

76.     As discussed above, the Principals obtained the account login information - usernames and passwords – for the Broker A accounts in order to access the accounts both directly, and from the Recruiters, who had obtained it from the Recruits.

77.     By giving the Principals account login credentials, the Recruiters provided the Principals with substantial assistance in executing their free riding scheme.

78.     The Recruiters knew, or were reckless in not knowing, the Principals intended to use the accounts for their free riding scheme.

79.     After obtaining control of the account, the Principals converted most of the Broker A accounts that they controlled to Broker A Gold accounts, allowing them to obtain up to generally $5,000 in credit on each account.  The Principals initiated directly, or indirectly through the Recruits, the funds transfer requests that triggered the instant deposit credit.

80.     The majority of Broker A accounts used in the scheme initiated wire transfers of funds from linked bank accounts approximating the $5,000 Broker A Gold limit.

**b.      Establishment of the Winner Accounts at Other Broker-Dealers**

81.     The Principals used online brokerage accounts in their own names as Winner Accounts for the scheme.  These accounts were generally held at broker-dealers other than Broker A, in order to conceal the Defendants' role in the scheme and evade detection by Broker A.

82.     The Principals recruited Nominees, directly and indirectly through the Recruiters, to open accounts in their own names for the Principals to trade in.  Using Nominees further disguised Defendants' role in the free-riding scheme.

83.     For example, Hernandez, through Recruit 1, solicited at least two Nominees and Flagg solicited at least one Nominee himself.

84.     The Principals each told their respective Nominees, in sum and substance, that he was a successful trader who could make profits for the Nominee by trading in the Nominee's account.  The Nominees, with the assistance of the Principals, set up brokerage accounts and ceded control of them, providing the account login credentials to the Principals directly, so that the Principals could trade in the respective accounts.

85.     Specifically, Hernandez told his Nominees that he would day trade in their accounts with his own money, which he wired into the brokerage accounts held in the Nominees' names.

86.     Flagg told his Nominee that he would trade the Nominee's money for the Nominee and used money that the Nominee deposited into the Nominee's brokerage accounts to trade.

87.     The Principals' Nominees had no trading experience and understood generally that the Principals were legitimate traders who traded in their accounts.

88.     Hernandez conducted some of his trading in the Nominees' accounts in the presence of one or both of the Nominees, using each Nominee's mobile phone to trade in the respective accounts.

89.     The Principals paid the Nominees what they told the Nominees was a percentage of the trading profits in exchange.

90.     The Recruiters also served as Nominees for the Principals.  The Recruiters set up, or allowed the Principals to use their personal information to set up, brokerage accounts in their names that they knew or were reckless in not knowing that the Principals would use as Winner Accounts in the scheme.

91.     For example, in a text message exchange between Lloyd and Hernandez, Lloyd sent Hernandez a screenshot of email correspondence Lloyd received from a broker-dealer.  The screenshot was of an email from the broker dealer approving Lloyd's application to add option trading strategies to a brokerage account in his name.  Hernandez responded to Lloyd that the email

"…Seems legit."  A second screenshot sent from Lloyd to Hernandez, shows Lloyd in the same broker-dealer's mobile app, in a section of the app that allowed Lloyd to link his bank account to the brokerage account opened in his name (the "Lloyd Brokerage Account") and initiate a funds transfer from his bank account to the Lloyd Brokerage Account.  The Lloyd Brokerage Account had been opened on April 29, 2021, and used as a Winner Account for the matched trading scheme, as described below, beginning on May 5, 2021, for approximately one month, trading against at least 15 Broker A Loser Accounts.  As a result of the trading in the Lloyd Brokerage Account as a Winner Account against the Broker A Loser Accounts, Broker A suffered losses of approximately $37,905.

92.     By using these Nominee accounts, the Defendants were able to conceal the nature and extent of, as well as their roles in, the fraud.

**C.  Defendants Engage in Matched Trading to Take Advantage of Instant Deposit Credit**

93.     The Principals generally began to trade in the Broker A accounts opened by the Recruits within days after an account was opened and almost immediately after the instant deposit credit was available in the Loser Account.

94.     Once trading began, they traded continuously until they had essentially exhausted the instant deposit credit.  In most instances, in order to use the full instant deposit credit, the trading began and ended on the day it started, before Broker A learned there were insufficient funds in the linked bank account to fund the brokerage account.

95.     In order to maximize profits in their scheme, the Principals primarily traded in stock options.  A stock option, commonly referred to as an "option," gives its purchaser-holder the right to buy or sell shares of an underlying stock at a specified price (the "strike price") prior to the expiration date. Options are generally sold in "contracts," which give the option holder the opportunity to buy or sell 100 shares of an underlying stock. The 100 shares underlying a stock

option contract can serve to provide leverage and the potential for greater profits than simply purchasing the stock.

96.    "Put" options are another form of options. A "put" option gives the purchaser-holder of the option the right, but not the obligation, to sell a specified amount of an underlying security at a specified price within a specific time-period. Selling, or "writing," "put" options for purchase by another market participant is one method of profiting when the writer believes that the underlying stock price will rise in value. If the price of the underlying stock rises above the put option's strike price, the option will be "out of the money" and cannot be exercised for a profit. The writer of the put option keeps the money paid for the put option and profits from the transaction.

97.    The Principals sold illiquid put options at highly inflated prices from the Winner Accounts they controlled to the Loser Accounts set up by the Recruits, in what appeared to be arms-length transactions. However, the Principals controlled both sides of the trades.

98.    Often the underlying options were in the stock of companies that were the subject of merger or takeover offers, which caused the price of existing options to initially rise or fall but then typically trade within a narrow range after the announcement of the merger or takeover. This allowed the Principals to select put options to trade that were out of the money by a large margin and for which there was limited liquidity. This in turn allowed the Loser Accounts and the Winner Accounts to "match" trades at prices which no rational market participants would trade.

99.    After completing the initial sale of the out of the money put options from the Winner Accounts to the Loser Accounts, the Principals then bought the options back from the Loser Accounts to the Winner Accounts at a lower, non-inflated price. This allowed the Winner Accounts to reap the profits of the trade, while the Loser Accounts took the loss.

a.     **Mechanics of the Matched Trading, Generally**

100.     In connection with Defendants' scheme, a typical matched trading transaction worked as follows: a Winner Account would post a limit order on an exchange, offering to "sell to open," or short, several contracts in a particular series of put options.

101.     A limit order allows the trader to set the minimum price at which they will sell (or the maximum price for which they will buy) the options contracts.

102.     The selected put options were thinly-traded and were usually deep out of the money. Deep out of the money options generally trade at very low prices because they have minimal chance of ever becoming in the money or obtaining any meaningful value.

103.     Further, as described above, most of the securities' issuers had been previously announced as merger or takeover targets and thus those stocks would typically trade in a very narrow range between the time the deal was announced, and the deal closed.  Options with these characteristics usually sold for around $0.05-$0.10 per contract.

104.     The Principals typically used the Winner Accounts to set the limit order at a price far above normal market prices but within the allowed price range of the exchange-imposed bid-ask spread,[2] for options that generally sold in the $0.05-$0.10 range.

105.     At the inflated price, the option would not typically sell, particularly given the low volume of the selected option series, and the minimal chance that the underlying stock's price would fall enough to allow the put options to become valuable.

106.     At the same time as the Winner Account's "sell to open" limit order was listed by the exchange; the Principals used the Loser Account to place an order to buy ("buy to open") the exact

---

[2]     Exchanges typically require as much as a $5.00 spread (*i.e.*, $0.10 - $5.10) to be maintained by designated market makers who made markets in those option contracts.

same put option series at or slightly higher than the limit price of the Winner Account's sell to open order.

107.    Because no market participants were selling at lower prices, and no legitimate market participants were interested in buying for such a high price, the exchange would automatically match the trades placed by the Winner and Loser Accounts in a transaction, filling the sell order from the Winner Account with the buy order from the Loser Account, giving the Winner Account a credit for the trade.

108.    The Winner Account would then typically cover the established short option position at or near the more favorable, lower, market price, to generate a quick profit.

109.    To close out the open options position, the Loser Account would place an offer to sell those options contracts ("sell to close") at or near market price, while at the same time, the Winner Account would post a bid to buy ("buy to close") the same number of contracts, from the same options series, also at or near market price.

110.    The exchange would again automatically match the trades placed by the Winner and Loser Accounts, closing out the positions for both accounts.

111.    These round-trip trades locked in the profits of the trade for the Winner Accounts and the losses, in the same amount, for the Loser Accounts.

112.    The Principals coordinated the trading in the Winner and Loser Accounts, deliberately structuring the pricing and quantity of the trades in order to exhaust the up to $5,000 instant deposit credit they received in the Broker A accounts.

113.    To further obfuscate their scheme, the Principals traded the same options series between multiple accounts and multiple options series between single accounts.  In other words, the Principals matched trades between a single or several issuers in one Winner Account and multiple

Loser Accounts, or between multiple Winner Accounts and one Loser Account, until the Loser Account had exhausted the credit.

### b.    Examples of the Matched Trading Activity by the Principals

#### 1.    October 7, 2020 Hernandez SINA Trading

114.    On October 7, 2020, Hernandez, trading in a brokerage account in his name held at a broker-dealer other than Broker A ("Winner 1"), offered for sale certain SINA Corp. ("SINA") put options contracts with a strike price of $30.

115.    At the time, SINA's stock was trading at around $42.70.  The previous week, on September 28, 2020, New Wave Holdings Ltd. had announced its proposal to acquire SINA for $43.30 per share.  The put options did not have any trades in the market other than those that were part of the scheme.

116.    Since the put option strike price was significantly below the underlying stock price, the options had little value – they were out of the money and illiquid.

117.    Nonetheless, Hernandez put in his offer to sell the put options from the Winner 1 account at $4.50, significantly higher than the value of those options.

118.    A Broker A Gold account ("Loser 1") opened by a Recruit that had initiated a $5,000 funds transfer from its linked bank account and was funded by an instant deposit credit in the same amount that day, bought the put options at the offered price.

119.    Minutes after these trades, Hernandez, trading in the Winner 1 account, bought the same put options back from the Loser 1 account at $0.25 per contract, earning profits of $850 for the Winner 1 account.  The Loser 1 account suffered losses in the same amount.

120.    Accounts in which Hernandez conducted the matched trading strategy accounted for all trading volume in this SINA put option series that day.

### 2. October 16, 2020 Hernandez SINA Trading

121.    On October 16, 2020, Hernandez, trading again in the Winner 1 account, offered for sale SINA put options contracts of the same put option series at $3.90.  That day, those put options did not have any trades in the market other than those that were part of the scheme.

122.    The options were deep out of the money.  The price of the options order was again, far above the value of the options.

123.    That same day, a second Broker A Gold account ("Loser 2") opened by a Recruit, had initiated a funds transfer from its linked bank account for $5,000 and had received an instant deposit credit in the same amount.

124.    The Loser 2 account bought the put options at the offered price.  Minutes later, Hernandez, trading in the Winner 1 account, bought the options back from the Loser 2 account at $0.35 per contract, for a profit of $1,065, causing a loss to the Loser 2 account in the same amount.

125.    Accounts in which Hernandez conducted the matched trading strategy, again, accounted for all trading volume in this SINA put option series that day.

### 3. October 22, 2020 Hernandez VAR Trading

126.    On October 22, 2020, Hernandez, trading in the Winner 1 account, offered for sale 1 Varian Medical Systems, Inc. ("VAR") put option contract with a strike price of $60, while VAR's stock was trading around $171.73 – again an out of the money option.  VAR had earlier received a proposal to be acquired by Siemens Healthineers AG for $177.50 per share on August 2, 2020.

127.    In the Winner 1 account, Hernandez placed a trade to offer to sell the put options at $4.50.  That day, those put options did not have any trades in the market other than those that were part of the scheme.

128.    The options were deep out of the money.  The price of the options order was again, far above the value of the options.

129.    Also on that day, Hernandez had opened, or directed to be opened and linked to a bank account, a Broker A Gold account in the name of a third party that he controlled ("Loser 3"), and had initiated a funds transfer for, and received an instant deposit credit of, $5,000 in the Loser 3 account.

130.    Hernandez bought the put options in the Loser 3 account at the inflated price he had offered them from the Winner 1 account.

131.    Then Hernandez, trading in the Winner 1 account, bought them back from the Loser 3 account that he was also trading, in minutes later at $0.25.  As a result of the matched trades Hernandez conducted between two accounts that he controlled, the Winner 1 account gained a profit of $375, while the Loser 3 account suffered losses in that same amount.

132.    Accounts in which Hernandez conducted the matched trading strategy accounted for nearly all trading volume in this VAR put option series on that day.

133.    Each of the Loser 1, 2 and 3 accounts began trading moments after having initiated funds transfers, and receiving Broker A instant deposit credits, of $5,000, and each exhausted its respective credit – conducting the entirety of the account's trading – that same date.

134.    The funds transfers for all three Loser Accounts were reversed within days, leaving each account with a balance of at least -$4,990; thereafter, the accounts were abandoned, leading Broker A to close them and absorb the losses.

4.    November 20, 2020 Hernandez Nominee VAR Trading

135.    In addition to the examples above where Hernandez executed trades in Winner Accounts in his name, he further executed the matched trading strategy in Winner Accounts held in the names of his Nominees.

136.    For example, on or around October 22, 2020, at Hernandez's direction, Nominee 1 opened a brokerage account for Hernandez to trade in ("Hernandez Nominee Account").

137.    A Broker A Gold account ("Loser 4") was opened by a Recruit on November 15, 2020. Five days later, on November 20, 2020, the Loser 4 account initiated funds transfers totaling $5,000 from its linked bank account and consequently received instant deposit credit of $5,000.

138.    That same date, Hernandez asked for and obtained the account login information for the Hernandez Nominee Account from Nominee 1 by text. Shortly thereafter Hernandez began trading in the Hernandez Nominee Account and offered for sale certain VAR put option contracts, with a strike price of $65. At the time VAR's stock was trading around $173.

139.    On that date, in the Hernandez Nominee Account, Hernandez also offered for sale certain SINA put option contracts, at strike prices of $17.50 and $25.00. SINA's stock was trading at around $43.

140.    Both the VAR and SINA put options were deep out of the money and thus had little to no value. Nevertheless, Hernandez selected highly inflated offer prices of $4.50 for the VAR put options and between $4.20 and $4.90 for the SINA put options. That day, those put options did not have any trades in the market other than those that were part of the scheme.

141.    The Loser 4 account bought the VAR and the SINA put options at the offered prices. The trades in the Loser 4 account were placed from the same IP address (*i.e.*, the same location) as was used for the Hernandez Nominee Account. Minutes later, Hernandez, trading in the Hernandez Nominee Account, bought the VAR put options back from the Loser 4 account at $0.25.

142.    At or about the same time, Hernandez, again trading in the Hernandez Nominee Account, bought the SINA put options back from the Loser 4 account at prices ranging from $0.05 to $0.10.

143.    As a result of the trading on November 20, 2020, Hernandez's total combined profits were $4,930 in the Hernandez Nominee Account. The trading in the Loser 4 account on

November 20, 2020, exhausted the $5,000 instant deposit credit Broker A had extended and resulted in losses to the account of $4,930.

        5.     June 14, 2021 Flagg TARO Trading

144.    Flagg executed the trading scheme through accounts in his name as well.  For example, on June 14, 2021, Flagg, trading in a brokerage account in his name held at a broker-dealer other than Broker A ("Winner 2"), offered for sale certain Taro Pharmaceutical Industries Ltd ("TARO") put options contracts with strike prices of $40 and $45.  At the time, TARO stock was trading at around $75.77.

145.    These put options were considered deep out of the money and thus had little to no value.  Nevertheless, Flagg put in his offer to sell the put options from the Winner 2 account, selecting highly inflated offer prices for the put options at between $1.00 and $2.50, many times the values of those options.  That day, those put options did not have any trades in the market other than those that were part of the scheme.

146.    The same day, a Broker A Gold account ("Loser 5") was opened by a Recruit and linked to a bank account.  Shortly thereafter that day, the Loser 5 account initiated funds transfers totaling $1,500 and consequently received an instant deposit credit in the same amount.  The Loser 5 account bought the TARO put options at the offered price.

147.    Minutes after these trades, the Winner 2 account bought the same put options back from the Loser 5 account at $0.10 per contract, earning profits of $1,270, resulting in the same amount of loss to the Loser 5 account.

148.    Two days later, on June 16, 2021, the funds transfers initiated by the Loser 5 account were reversed due to insufficient funds in the linked bank account, resulting in a balance of -$1,470 in the Loser 5 account.  Thereafter the Loser 5 account was abandoned, leading Broker A to close it

and absorb the loss.  Accounts in which Flagg conducted the matched trading strategy accounted for nearly all trading volume in these particular TARO put option series.

149.    Flagg repeated this trading pattern in the Winner 2 account with other issuers' put options contracts and/or other Broker A accounts, generating additional profits in the account.

6.    September 21, 2021 Flagg Nominee TARO Trading

150.    Similar to Hernandez, Flagg executed the matched trading strategy in his Nominee Winner Accounts in addition to accounts held in his name.

151.    On or around September 21, 2021, at the direction of Flagg, Nominee 2 opened a brokerage account for Flagg to trade in (the "Flagg Nominee Account").  Flagg began selling deep out of the money put options in the account the next day.

152.    On September 27, 2021, Flagg, trading in the Flagg Nominee Account offered for sale certain TARO deep out of the money put option contracts, with a strike price of $45, while TARO's stock was trading around $63.  These put options had little to no value.  Nevertheless, Flagg selected offer prices for the put options at between $1.60 and $3.00, many times the values of those options.  That day, those put options did not have any trades in the market other than those that were part of the scheme.

153.    Earlier that day, a Broker A Gold account ("Loser 6") held by a Recruit that had been opened and linked to a bank account previously, initiated funds transfer requests that caused the Loser 6 account to be funded by an instant deposit credit of $5,000.  Using that credit, the Loser 6 account bought the put options contracts at the price that Flagg offered.

154.    Minutes later, Flagg, trading in the Flagg Nominee Account, bought the TARO put options back from the Loser 6 account at $0.10, earning profits of $1,125 in the Flagg Nominee Account, resulting in that same amount of loss in the Loser 6 account.  Later, on September 27, 2021, however, funds transfers that had been initiated to the Loser 6 account in the amount of

approximately $2,300 were reversed due to insufficient funds in the linked bank account.  Accounts from this scheme accounted for nearly all trading volume in TARO put options that day.

155.    The Loser 6 account continued this trading pattern, using the Broker A instant deposit credit to trade these and other issuers' deep out of the money put contracts at inflated prices with other Winner Accounts and generating additional losses, resulting ultimately in a balance of approximately -$2,685.  Thereafter, the Loser 6 account was abandoned, leading Broker A to close it and absorb the loss.

156.    Flagg repeated this trading pattern in the Flagg Nominee Account with other Broker A accounts and other issuers' deep out of the money put contracts, generating additional profits in the Flagg Nominee Account.  On September 29, 2021, Nominee 2, again at Flagg's direction, wired $6,700 from the Flagg Nominee Account to a bank account in Nominee 2's name and later that same day, at Flagg's direction, sent $1,700 from that bank account, using her debit card, to Flagg via Cash App.

**D.    Defendants Deceive Broker A and Act with the Requisite Scienter**

158.    Defendants deceived Broker A by essentially using the Broker A Loser Accounts and the instant deposit credit extended them to pay the Winner Accounts the profits of the matched trading, at Broker A's expense.

159.    Defendants intentionally deceived Broker A by soliciting and directing the Recruits to open Broker A accounts in their own names, in order to conceal Defendants' identity and involvement in the accounts' activity.

160.    Defendants also intentionally deceived Broker A directly, and indirectly through the Recruits, by making representations to Broker A in connection with opening the accounts that Defendants knew to be false: specifically, that (1) the Recruits would have sufficient funds in their linked bank accounts to repay the instant deposit credit Broker A had extended, when Defendants

directed the Recruits to make sure there were no funds in the linked bank accounts to repay that credit; (2) the Recruits would obtain Broker A's approval and authorization before allowing others to trade in their accounts, when Defendants directed the opening of Broker A accounts with the intent of trading in and controlling the accounts, under the guise of trading as the respective Recruits; and (3) the Recruits would keep their usernames and associated emails confidential and not share them with third parties, when Defendants directed the Recruits to provide their usernames to them and changed the associated emails to those of Defendants' own choosing so as to maintain control, while concealing the extent of that control.

161.    Defendants also intentionally deceived Broker A by churning through hundreds of Broker A accounts, all in the names of others to perpetuate the scheme.

162.    The Recruiters knew or were reckless in not knowing the existence of the free-riding scheme.

163.    The Recruiters knew or were reckless in not knowing that the Principals were trading in Broker A accounts in the names of others and assisted the Principals in doing so.

164.    The Recruiters each provided substantial assistance through soliciting Recruits to open brokerage accounts for the Principals to trade in and they each allowed the Principals to trade in brokerage accounts in their own names.

165.    The Recruiters each provided substantial assistance by providing the Principals with account login credentials so that the Principals could control the Broker A accounts.

166.    The Recruiters knew or were reckless in not knowing that the Principals were trading on Broker A's instant deposit credit and that use of that credit was essential to the fraudulent scheme.

167.    The Recruiters knew or were reckless in not knowing that Hernandez traded in the Broker A accounts with urgency, before Broker A restricted the Loser Accounts, that such

restrictions were inevitable given the nature of the scheme, that the accounts were being closed soon after they were opened and that more accounts were needed to continue the scheme.

168.    The Recruiters each opened or allowed at least Hernandez, to open, bank accounts that each held jointly with Hernandez that were used to receive the illicit trading profits.  At the Principals' direction the Recruiters transferred profits from Winner Accounts in their names to the joint bank accounts they held with Hernandez, allowing Hernandez to access the illicit proceeds for his own use.

### E.    Broker A's Losses/Defendants' Ill-Gotten Gains

173.    For the period between November of 2018 and January of 2022, Defendants' scheme trading resulted in illicit profits of approximately $2.08 million.

174.    The Principals received ill-gotten gains in the form of trading profits in the Winner Accounts.

175.    The Recruiters received ill-gotten gains in the form of payment per Broker A account they provided that the Principals used and payments they received for transferring money between bank accounts that the Principals controlled, at the Principals' direction.

176.    Specifically, the Principals earned profits of close to $5,000 per account (*i.e.*, the amount of the instant deposit credit) – a total of the profits made in each of the counter-trading Winner Accounts – for the majority of Broker A Gold accounts used in the scheme.

177.    They typically withdrew the profits within a few days of realizing them.  Hernandez, in particular, transferred the trading profits to bank accounts in his name, and directed Ortiz and Lloyd to do the same.

178.    Hernandez then paid Ortiz and Lloyd a portion of the trading profits for their role in this part of the scheme in addition to paying them for opening Loser Accounts.

179.    Similarly, with regard to the Nominees, both Principals directed that they send trading profits in Nominee accounts to themselves.  They then paid the Nominees for the use of their accounts.

## FIRST CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5(a) and (c) Thereunder
(Against Defendants Hernandez and Flagg)

180.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 179 of this Complaint.

181.    By virtue of the foregoing, Defendants Hernandez and Flagg, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, and/or (ii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon Broker A, by engaging in free-riding in Broker A's accounts, and conducting a matched trading strategy that essentially transferred the instant deposit credit funds, fraudulently obtained from Broker A through the free-riding, to accounts in their own control, which they then used for their own purposes.

182.    By reason of the foregoing, Hernandez and Flagg, directly or indirectly, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 (a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 20(b) and Rule 10b-5(a) and (c) Thereunder
(Against Hernandez and Flagg)

183.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 179 of this Complaint.

184.    Section 20(b) of the Exchange Act precludes any person, directly or indirectly, from

doing any act which would be unlawful under the Exchange Act for such person to do, through or by means of any other person.

185.    By virtue of the foregoing, Defendants Hernandez and Flagg, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, and/or (ii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons or entities, to wit Broker A, by using the Recruiters and the Recruits, to open the Loser Accounts at Broker A, through which Hernandez and Flagg engaged in free-riding, obtained Broker A's instant deposit credit, and conducted the losing trades essential to the matched trading scheme, and by using the Nominees to open Winner Accounts through which Hernandez and Flagg conducted winning trades of the matched trading scheme and through which Hernandez and Flagg funneled their illicit trading profits such that they were able to access the funds. These acts, done through and by means of the Recruiters, Recruits and Nominees, violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder.

186.    By reason of the foregoing, Hernandez and Flagg, directly or indirectly, singly and in concert, have violated and, unless enjoined, will again violate Exchange Act Section 20(b) [15 U.S.C. § 78t(b)].

### THIRD CLAIM FOR RELIEF
**Aiding and Abetting Violations of Exchange Act Section 10(b)
and Rule 10b-5(a) and (c) Thereunder**
(Against Lloyd and Ortiz)

187.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1-7, 9-14, 16-51, 60-82, and 90-179 of this Complaint.

188.    By virtue of the foregoing, Defendants Hernandez and Flagg violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder.

189.    Defendants Lloyd and Ortiz, by specifically recruiting Recruits to open Broker A Loser Accounts for use in the scheme, directly or indirectly, singly or in concert, knowingly and/or recklessly provided substantial assistance to these violations by Hernandez and Flagg.

190.    By reason of the foregoing, pursuant to Exchange Act, Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants Lloyd and Ortiz directly and indirectly, singly or in concert, have aided and abetted Defendants Hernandez's and Flagg's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining and restraining each of the Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

### II.

Imposing conduct-based injunctions prohibiting Defendants Hernandez and Flagg each from: directly or indirectly, trading securities in any brokerage account he owns, controls, or has access to that does not have settled cash equal to or greater than the amount of the securities trade(s);

### III.

Imposing conduct-based injunctions prohibiting each Defendant from: opening a brokerage account without first providing to the relevant brokerage firm(s) a copy of the Commission's filed

complaint in this matter and any judgment that the Commission may obtain against him in this matter;

## IV.

Ordering each of Defendants to disgorge their ill-gotten gains received as a result of the conduct alleged in this Complaint, plus prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

## V.

Ordering each of the Defendants to pay civil monetary penalties pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

## VI.

Granting any other and further relief this Court may deem just and proper.

Dated:  New York, New York
        October 31, 2023

*Christopher J. Dunnigan*
_____
Christopher J. Dunnigan
Cynthia A. Matthews
Joseph G. Sansone
Lindsay S. Moilanen
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY  10004-2616
(212) 336-0061 (Dunnigan)
dunnigancj@sec.gov